.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Michael Kelly for M.L.K, | : | Case No. 4:10-CV-976 |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM DECISION AND ORDER** |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying Plaintiff's claim for Supplemental Security Income (SSI) under Title XVI of the Act. Pending are the parties' Briefs on the Merits (Docket Nos. 14 & 20). For the reasons that follow, the Commissioner's decision is affirmed.

### I. PROCEDURAL BACKGROUND.

On October 14, 2004, Plaintiff Michael Kelly on behalf of his minor child, MLK, filed an application for SSI alleging that her disability began on August 15, 2004 (Docket No. 12, Exhibit 6, pp. 2-4 of 15). Plaintiff's request was denied initially and upon reconsideration (Docket No. 12, Exhibit 5, pp. 5-6 of 27). Plaintiff filed a timely request for hearing and on July 2, 2008, Administrative Law

Judge (ALJ) L. Zane Gill held a hearing at which Michael Kelly and MLK, represented by counsel, appeared and testified (Docket No. 12, Exhibit 2, p. 22 of 40). On June 24, 2008, the ALJ rendered an unfavorable decision denying an application for a period of SSI (Docket No. 12, Exhibit 2, pp. 10-21 of 40). On April 6, 2010, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's determination the final decision of the Commissioner (Docket No. 12, Exhibit 2, pp. 2-4). Plaintiff filed a timely Complaint in this Court seeking judicial review (Docket No. 1).

## II. FACTUAL BACKGROUND.

### A. MLK'S TESTIMONY

MLK confirmed that she was eleven years of age and that she was in the fourth grade (Docket No. 12, Exhibit 2, p. 26 of 40).

### B. COUNSEL'S SUMMARY.

Counsel for Plaintiff claimed that there were four medically determinable impairments at issue in this case: an adjustment disorder, a post traumatic stress disorder (PTSD), a learning disorder and the sexual abuse of a child. It was counsel's opinion that MLK had marked severity in acquiring and using information and interacting and relating with others and less than marked severity in attending and completing tasks (Docket No. 12, Exhibit 2, p. 27 of 40). The record contained confirmation from Drs. Chiarella, Dagley and Mathers that Plaintiff's condition had declined rather than improved.

Dr. Mathers assigned scores of 58, 60 and 55 to a numerical scale of zero through 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults. En.wikipedia.org/wiki/Global_Assessment_of_Functioning. The scores ascribed by Dr. Mathers indicated that MLK had moderate symptoms or moderate difficulty in social, occupational, or school functioning.

Dr. Dagley assessed MLK's intelligence quotient as relatively fair in the 83 to 84 category and Plaintiff's socialization quotient was in the 70s. Plaintiff's counsel argued that these scores are consistent with a marked impairment in terms of socialization (Docket No. 12, Exhibit 2, p. 28 of 40).

Counsel advised that Dr. Constance Fullilove determined in 2005 that MLK suffered from post traumatic stress from sexual abuse, learning and socialization difficulties.

### C. PLAINTIFF'S TESTIMONY.

Plaintiff affirmed the accuracy of counsel's summary. In addition, Plaintiff advised that he and MLK had resided together for the past six years. MLK saw her mother periodically (Docket No. 12, Exhibit 2, p. 36 of 40). In Plaintiff's opinion, MLK had difficulty reading, doing math or assimilating social studies. She had been tutored since the middle of her fourth grade school year. Since MLK had already repeated the fourth grade, she was in summer school preparing to attend fifth grade classes. Plaintiff testified that MLK will attend another school next year (Docket No. 12, Exhibit 2, p. 29-30 of 40).

Plaintiff advised that the persons responsible for the sexual abuse of his daughter were imprisoned (Docket No. 12, Exhibit 2, pp. 31-32). He suggested that because of the sexual abuse, his daughter did not adjust well. In addition to being unable to multitask, Plaintiff was often insubordinate, argumentative, angry, lazy, forgetful, facetious and defiant (Docket No. 12, Exhibit 2, pp. 31-32, p. 34, p. 35 of 40). MLK fought with her brother who was sixteen years of age. She was apparently content with riding her bicycle or skating (Docket No. 12, Exhibit 12, p. 33 of 40).

### III. EDUCATIONAL RECORDS.

In October 2003, MLK took the Stanford Achievement Test which measures a student's expected

or potential acquisition of knowledge or skills and delivers reliable data to evaluate progress on national and state standards and assesses the abilities that directly relate to success in school. Www.pearsonassessments.com. MLK performed in the low range in categories of sounds and letters, word and sentence reading, math, environment and listening (Docket No. 12, Exhibit 9, p. 5 of 7; Exhibit 10, p. 2 of 23). During her kindergarten year, MLK made fair progress except that she did not know her right from left, she could not count objects with understanding or solve problems. MLK was deficient in her "ability to apply letter sound knowledge to writing and learning sight words." By year's end, she was able to work well independently (Docket No. 12, Exhibit 9, p. 6 of 7).

During the 2004-2005 school year, MLK attended the Youngstown City Schools. On February 25, 2005, MLK became insolent when instructed by her teacher to sit down. She was removed from the classroom for twenty-four hours (Docket No. 12, Exhibit 8, p. 7 of 8). On May 19, 2005, MLK was on the computer. She became angry when kicked off the computer so she refused to do anything including moving away from the computer. She was given a verbal reprimand (Docket No. 12, Exhibit 8, p. 6 of 8). At the conclusion of the 2004-2005 school year, MLK's teacher determined that she had not successfully completed the second grade program and she needed more time to acquire the basic skills. It was recommended that she continue to work in second grade (Docket No. 12, Exhibit 9, p. 7 of 7).

### IV. MEDICAL EVIDENCE.

Dr. Jason B. Kovalcik, M. D., a pediatrician, treated MLK for runny ears, painful urination and a fungal infection on June 18, 2004 (Docket No. 12, Exhibit 11, p. 11-13 of 35).

On August 13, 2004, Dr. Alba J. Ortega-Close, M. D., a pediatrician, acknowledged that MLK was obese. In the past, MLK had been treated for "runny ears," painful urination, a fungal infection and conjunctivitis with allergy medications and ear drops. Her new problems included involuntary urination.

4

Dr. Ortega-Close was suspicious that MLK had been sexually abused (Docket No. 12, Exhibit 11, pp. 2-4 of 45).

On June 18, 2004, Dr. Carrie Oklota, M. D., a pediatrician, ordered lab tests to determine MLK's thyroid level.  The results were within a normal range (Docket No. 12, Exhibit 11, pp. 14-15 of 35).  Dr. Oklota administered tests for the presence of the human immunodeficiency virus on August 18, 2004.  She could not rule out previous exposure; however, she did determine that the results indicated that antibodies were not found in the present specimen.  MLK tested negative for the presence of hepatitis B or other bacteria (Docket No. 12, Exhibit 11, pp. 5-9 of 35).

From June 13, 2004, to October 5, 2005, MLK underwent treatment at the Youth and Family Resource Center.  The initial plan was to improve her anxious mood which resulted in overeating and weight gain; reduce the frequency of bed-wetting episodes; and increase on task behaviors (Docket No. 12, Exhibit 12, pp. 10, 21-24 of 24; Exhibit 13, p. 8 of 35).  On March 30, 3005, the counselor noted that MLK was starting to improve (Docket No. 12, Exhibit 12, p. 15 of 24).  MLK continued to make "some" progress on April 15 and April 22, 3005 (Docket No. 12, Exhibit 12, pp. 12, 13 of 24).  By May 13, 2005, the counselor opined that MLK's level of functioning was slightly worse.  She had gotten into a fight on the school bus and she was caught stealing at a store (Docket No. 12, Exhibit 12, p. 11 of 24).  The counselor opined on October 11, 2005, that MLK had made a fair improvement in binge eating and addressing anger issues during their intervention (Docket No. 12, Exhibit 13, pp. 3-5 of 35).

Dr. David Chiarella, Ph. D., conducted a psychological evaluation on January 25, 2005, based on a clinical interview with MLK and her parents.  MLK's medical history was unremarkable. Her academic performance was influenced by her inability to read.  Dr. Chiarella observed that MLK's speech was intelligible and her sensory stimuli were intact.  She did not demonstrate any unusual or atypical test

5

taking behaviors.  She was able to attend and concentrate.  She did not demonstrate a heightened degree of body activity.  MLK was able to concentrate as well as persist in goal directed activities.

MLK avoided answering the question about her sexual abuse and denied any significant or intrusive recollections of the event.  She did admit, however, that she had nightmares which had subsided.  There were no admissions of suicidal or homicidal ideations.  She denied any use of drugs, alcohol or tobacco products.

Dr. Chiarella diagnosed MLK with adjustment disorder with mixed disturbance of emotion and conduct and PTSD, in partial remission.  He concluded that she had moderate symptoms or moderate difficulty in social, occupational, or school functioning and assigned a global assessment of functioning (GAF) score of 58 (Docket No. 12, Exhibit 11, pp. 18-21 of 35).

On March 29, 2005, Donald Degli, M. A., conducted a clinical interview during which he administered the Wechsler Intelligence Scale for Children-IV (WISC), the Wide Range Achievement Test-3 (WRAT), the Bender-Gestalt Test and Vineland Adaptive Behavior Scales.  The results from the WISC, a test that measures a child's general cognitive abilities, yielded a full scale intelligence quotient of 83.  This placed MLK in the low average range of intelligence.  Her sub intelligence quotients were in the low average range.  She revealed mild deficiency with matrix reasoning skills, with noteworthy deficiency in abstracting tasks.  She was a "bit" weak with vocabulary (Docket No. 12, Exhibit 11, pp. 26-27 of 35).

The results from the WRAT examination, another test that assesses cognitive abilities of children, showed that MLK read at a first grade level.  The quality of her responses indicated to the administrator that she was troubled with a learning disability.  She recognized and pronounced *milk* or *red* and spelled *go* and *cat*.  She could not spell *will* or *run*.

MLK 's results from the Bender Gestalt Test, a measurement of developmental disorders and neurological function, yielded drawings that marginally represented the stimulus designs. She crudely printed her name at the top of the page and made efforts to integrate two-part designs. When attempting to correct her drawings, they were "further regressed."

The Vineland Adaptive Behavior Scales measures adaptive behaviors such as socialization and everyday living skills. MLK's results revealed deficiencies in the communication, daily living skills and socialization domains. Her vocabulary was below average and her reading and spelling skills were "not only weak" but "haltingly employed and stagnating" at a nonfunctional first grade level. In the daily living skills domain, she was having difficulty with household chores, she was not meeting the demands of school and she could not handle money matters at age level. She was argumentative with peers and hypersensitive to "slight" and criticism (Docket No. 12, Exhibit 11, p. 27 of 35).

In conclusion, Mr. Degli diagnosed MLK with a dysthymic disorder, PTSD, a learning disorder, not otherwise specified and disruptive behavior disorder, not otherwise specified. He further observed that she had moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 12, Exhibit 11, p. 28 of 35).

On April 18, 2005, Dr. Roseann Umana, a clinical psychologist, affirmed the findings of Mr. Degli. She concluded that MLK had severe impairments but they did not, individually or in combination with each other, medically equal or functionally equal the listings (Docket No. 12, Exhibit 11, p. 33 of 35).

Dr. Constance Fullilove, a clinical psychologist, conducted a case analysis on May 16, 2005, and concluded that MLK has less than marked limitations in acquiring and using information and in interacting and relating with others. Even if she had a marked limitation in social interactions, MLK

would not meet or equal the listing. At that time MLK was not manifesting marked limitations in functioning. She suffered from trauma and violence that were unspeakable, yet she did not show signs of disturbance (Docket No. 12, Exhibit 12, p. 6 of 24).

On December 6, 2005, Dr. Melissa Valantine Ferrara, M. D., conducted a well child examination. She concluded that MLK was overweight. She questioned MLK's thyroid fullness and whether she had scoliosis. She recommended a diet and exercise schedule and made an orthopedic referral for scoliosis (Docket No. 12, Exhibit 13, pp. 34-35 of 35).

Dr. Chiarella conducted another clinical interview on December 6, 2005. He concluded that MLK had a significant learning difficulty, particularly with basic reading and spelling. However, during the interview, she was able to attend and concentrate, use and understand conversational speech and language and relate adequately to Dr. Chiarella. He reaffirmed his prior diagnosis of adjustment disorder with mixed disturbance of emotion and conduct and PTSD. He noted that MLK was also sexually abused and her episodes of bed wetting were in remission. It was Dr. Chiarella's opinion that MLK had moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 12, Exhibit 13, p. 11 of 35).

MLK underwent treatment at the Family Service Agency beginning on January 3 through May 8, 2006. MLK was persistently plagued with familial stressors. As a result, her level of anxiety and childishness increased. It was noted that MLK continued to be argumentative with students and she had a mean streak. There were incidences of physical aggression. At discharge from treatment, the counselor noted minimal progress due to (poor) attendance (Docket No. 12, Exhibit 14, pp. 4-5, pp. 8-10 of 26).

Dr. Karen Stailey, Ph.D., affirmed that MLK had an adjustment disorder on February 3, 2006. This impairment, according to Dr. Stailey, was not medically or functionally equal to the listing (Docket

No. 12, Exhibit 13, pp. 17-18 of 35).

Dr. J. James Anderson treated MLK for vomiting followed by abdominal pain. She was diagnosed and treated for a viral infection (Docket No. 12, Exhibit 13, p. 30 of 35).

On July 6, 2006, Dr. Ortega-Close treated MLK for a runny nose and wheezing. She diagnosed and treated MLK for allergic rhinitis (Docket No. 12, Exhibit 13, p. 27 of 35).

Dr. Pradeep Mathur conducted comprehensive psychiatric services from October 13, 2006, through January 9, 2008. Dr. Mathur prescribed Concerta® and Clonidine, both medicines designed to treat attention deficit hyperactivity disorder (Docket No. 12, Exhibit 14, pp. 12-18, 22-23 of 26).

On August 19, 2008, Dr. Michael Stern, Psy. D, conducted a clinical interview during which he administered the WISC and the WRAT assessments. The results from the WISC assessment indicated an average processing speed, low average perceptual reasoning, borderline working memory, deficient verbal comprehension and borderline overall intelligence quotient of 73. The WRAT assessment results showed borderline deficient reading abilities and very poor phonetic skills. Her comprehension was deficient for her age and her arithmetic skills were also in the borderline range (Docket No. 12, Exhibit 14, p. 25 of 26). Dr. Stern diagnosed MLK with attention deficit hyperactivity disorder, borderline intelligence and a reading disorder (Docket No. 12, Exhibit 14, p. 26 of 26).

### V. THE ALJ'S FINDINGS.

Upon consideration of the evidence, the ALJ made the following findings:

1. MLK was born on February 14, 1997. Therefore, she was a school age child on October 13, 2004, the date the application was filed and she was currently a school age child.
2. MLK had not engaged in substantial gainful activity at any time relevant to this decision.
3. MLK had the following severe impairment: adjustment disorder, post traumatic stress disorder, learning disability and history of sexual abuse.
4. MLK did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.
5. MLK did not have an impairment or combination of impairments that functionally

9

        equaled the listings.
6.     MLK had not been disabled since October 13, 2004, the date the application was filed.

(Docket No. 12, Exhibit 2, pp. 13, 20 of 40).

## VI. STANDARD OF DISABILITY.

An individual under the age of 18 shall be considered disabled for purposes of this title if that individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i) (Thomson Reuters/West 2011). A three-step sequential evaluation process is employed to determine whether an individual under 18 is disabled. 20 C. F. R. § 416.924 (Thomson Reuters 2011). Specifically, the SSA will consider (1) whether the child is engaged in substantial gainful activity; (2) whether the child has a medically determinable severe impairment which is expected to result in death, has lasted or is expected to last for a continuous period of not less than 12 months and, if so, (3) whether the impairment or combination of impairments meets, medically equals, or functionally equals the severity of any impairment listed in the listing found at 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924 (a), (b), (c), (d) (Thomson Reuters/West 2011).

The SSA will find an impairment functionally equivalent to a Listing if the child has an extreme limitation in one area of functioning, or a marked limitation in two areas of functioning. 20 C.F.R. § 416.926a(b)(2) (Thomson Reuters/West 2011). If the child has a severe impairment or combination of impairments that does not meet or medically equal any listing, SSA will decide whether it results in limitations that functionally equal the listings. 20 C. F. R. § 416.926a (a) (Thomson Reuters 2011). By "functionally equal the listings," SSA means that your impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in

10

one domain, as explained in this section. 20 C. F. R. § 416.926a (Thomson Reuters 2011). An assessment of the functional limitations caused by the child's impairments will be made, for example, what the child cannot do, what the child has difficulty doing or needs help doing, or are restricted from doing because of his or her impairment(s). 20 C. F. R. § 416.926a(a) (Thomson Reuters 2011).

When making a finding regarding functional equivalence, SSA will assess the interactive and cumulative effects of all of the impairments for which there is evidence, including any impairments the child has that are not "severe." (*See* § 416.924(c)). 20 C. F. R. § 416.926a(a) (Thomson Reuters 2011). Assessing functional limitations, SSA will consider all the relevant factors in §§ 416.924a, 416.924b, and 416.929 including, but not limited to:

(1) How well the child can initiate and sustain activities, how much extra help the child needs, and the effects of structured or supportive settings (*see* § 416.924a(b)(5).
(2) How the child functions in school (*see* § 416.924a(b)(7); and
(3) The effects of your medications or other treatment (*see* § 416.924a(b)(9).

SSA will look at the information in the child's case record about how his or her functioning is affected during performance of all activities when deciding whether the impairment or combination of impairments functionally equals the listings. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). The child's activities are everything done at home, at school, and in the community. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). SSA will consider how the child appropriately, effectively, and independently performs activities compared to the performance of other children his or her age who do not have impairments. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). Consideration will be given to how the child functions in activities in terms of six domains. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). The domains are:

(i) Acquiring and using information;
(ii) Attending and completing tasks;
(iii) Interacting and relating with others;

11

   (iv)  Moving about and manipulating objects;
   (v)  Caring for yourself; and,
   (vi)  Health and physical well-being.

20 C. F. R. § 416.926a(b) (1) (i), (ii), (iii), (iv), (vi) (Thomson Reuters 2011).

When assessing whether the child can function in each domain, SSA will ask for and consider information that will help answer the following questions about whether the child's impairment(s) affects the child's functioning and whether the activities are typical of other similarly aged children who do not have impairments.

   (i)  What activities are you able to perform?
   (ii)  What activities are you not able to perform?
   (iii)  Which of your activities are limited or restricted compared to other children your age who do not have impairments?
   (iv)  Where do you have difficulty with your activities-at home, in childcare, at school, or in the community?
   (v)  Do you have difficulty independently initiating, sustaining, or completing activities?
   (vi)  What kind of help do you need to do your activities, how much help do you need, and how often do you need it?

20 C. F. R. § 416.926a(b)(2)(i), (ii), (iii), (v), (vi) (Thomson Reuters 2011).

SSA will decide that a child's impairment(s) functionally equals the listings if the impairment is of listing-level severity. 20 C. F. R. § 416.926a(d) (Thomson Reuters 2011). The child's impairment(s) is of listing-level severity if he or she has "marked" limitations in two of the domains in paragraph (b)(1) of this section, or an "extreme" limitation in one domain. 20 C. F. R. § 416.926a(d) (Thomson Reuters 2011). The term "marked" means a limitation in a domain when the child's impairment(s) interferes seriously with his or her ability to independently initiate, sustain, or complete activities. 20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters 2011). The child's day-to-day functioning may be seriously limited when his or her impairment(s) limits only one activity or when the interactive and cumulative effects of the child's impairment(s) limit several activities. 20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters

12

2011). "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." 20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters 2011).

"Extreme" limitation means a limitation that is "more than marked." 20 C. F. R. § 416.926a(e)(2)(i) (Thomson Reuters 2011). It does not necessarily mean a total lack or loss of ability to function. 20 C. F. R. § 416.926a(e)(3)(i) (Thomson Reuters 2011). SSA will find that the child has an "extreme" limitation in a domain when his or her impairment(s) interferes very seriously with his or her ability to independently initiate, sustain, or complete activities. 20 C. F. R. § 416.926a(e) (3)(i) (Thomson Reuters 2011). The day-to-day functioning may be very seriously limited when the child's impairment(s) limits only one activity or when the interactive and cumulative effects of his or her impairment(s) limit several activities. 20 C. F. R. § 416.926a(e)(3)(i) (Thomson Reuters 2011).

### VII. STANDARD OF REVIEW.

Under 42 U.S.C. § 405(g), a district court is permitted to conduct judicial review over the final decision of the Commissioner. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)).

13

Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)).  The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

## VIII. DISCUSSION.

Plaintiff argues that if the Court substantially construes the evidence in MLK's favor, there is substantial evidence that shows compliance with 112.05D of the Listing. Alternately, there is substantial evidence that MLK's impairments meet 112.08 (A) and (B) of the Listing.

Defendant contends that there is a lack of actual evidence substantiating the proposition that her condition satisfied the listing requirements. The ALJ reasonably found that MLK's impairments do not meet a listing.

A.  **112.05 OF THE LISTING**.

Section 112.05 of the Listing specifies the mental retardation category of impairment.  This

impairment is characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning. The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.

    A.    For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02;

    B.    Mental incapacity evidenced by dependence upon others for personal needs (grossly in excess of age-appropriate dependence) and inability to follow directions such that the use of standardized measures of intellectual functioning is precluded;
    or

    C.    A valid verbal, performance, or full scale IQ of 59 or less;
    or

    D.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an **additional and significant** limitation of function;
    or

    E.    A valid verbal, performance, or full scale IQ of 60 through 70 and:
        1.    For older infants and toddlers (age 1 to attainment of age 3), resulting in attainment of development or function generally acquired by children no more than two-thirds of the child's chronological age in either of paragraphs B1a or B1c of 112.02; or

        2.    For children (age 3 to attainment of age 18), resulting in at least one of paragraphs B2b or B2c or B2d of 112.02;
    or

    F.    Select the appropriate age group:

        1.    For older infants and toddlers (age 1 to attainment of age 3), resulting in attainment of development or function generally acquired by children no more than two-thirds of the child's chronological age in paragraph B1b of 112.02, and a physical or other mental impairment imposing an additional and significant limitation of function;
    or
        2.    For children (age 3 to attainment of age 18), resulting in the satisfaction of 112.02B2a, and a physical or other mental impairment imposing an additional and significant limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05 (Thomson Reuters 2011)

The presence of this mental disorder must be documented on the basis of reports from acceptable

sources of medical evidence. Descriptions of functional limitations may be available from these sources, either in the form of standardized test results or in other medical findings supplied by the sources, or both. (Medical findings consist of symptoms, signs, and laboratory findings.) Whenever possible, a medical source's findings should reflect the medical source's consideration of information from parents or other concerned individuals who are aware of the child's activities of daily living, social functioning, and ability to adapt to different settings and expectations, as well as the medical source's findings and observations on examination, consistent with standard clinical practice. As necessary, information from non-medical sources, such as parents, should also be used to supplement the record of the child's functioning to establish the consistency of the medical evidence and longitudinality of impairment severity.

In children with mental disorders, particularly those requiring special placement, school records are a rich source of data, and the required reevaluations at specified time periods can provide the longitudinal data needed to trace impairment progression over time. Reference to a "standardized psychological test" indicates the use of a psychological test measure that has appropriate validity, reliability, and norms, and is individually administered by a qualified specialist. By "qualified," SSA means the specialist must be currently licensed or certified in the state to administer, score, and interpret psychological tests and have the training and experience to perform the test.

Psychological tests are best considered as standardized sets of tasks or questions designed to elicit a range of responses. Psychological testing can also provide other useful data, such as the specialist's observations regarding the child's ability to sustain attention and concentration, relate appropriately to the specialist, and perform tasks independently (without prompts or reminders). Therefore, a report of test results should include both the objective data and any clinical observations. 20 C. F. R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters 2011).

16

Under subsection D, the claimant must have a verbal, performance, or full scale IQ of 60 through 70. Liberally construing the evidence in Plaintiff's favor, MLK is not impaired as defined in the mental retardation category of impairment. In 2005, MLK's full scale intelligence quotient was 83 (Docket No. 12, Exhibit 11, p. 26 of 35). When the WISC was administered in 2008, her full scale intelligence quotient was 73 (Docket No. 12, Exhibit 14, p. 25 of 26). In both instances, her general intelligence quotient exceeded the scores necessary to meet any of the median scores necessary to show intellectual inability. The Magistrate finds that the ALJ did not err in failing to consider whether MLK's impairments were consistent with the Listing 112.05 because there was no evidence satisfying the threshold intelligence quotient necessary to meet subsection D of Listing 112.05.

**B.**     **112.08 OF THE LISTING**

A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness. The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

    A.    Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

        1.    Seclusiveness or autistic thinking; or
        2.    Pathologically inappropriate suspiciousness or hostility; or
        3.    Oddities of thought, perception, speech and behavior; or
        4.    Persistent disturbances of mood or affect; or
        5.    Pathological dependence, passivity, or aggressivity; or
        6.    Intense and unstable interpersonal relationships and impulsive and damaging behavior;
    And
    B.    Resulting in at least two of the following:
        1.    Marked restriction of activities of daily living; or
        2.    Marked difficulties in maintaining social functioning; or
        3.    Marked difficulties in maintaining concentration, persistence, or pace; or

      4.      Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.08 (Thomson Reuters 2011).

Here, there is documented evidence from MLK's parents and teachers that she was belligerent, sassy and argumentative. Occasionally she became aggressive and fought her fellow students or sibling. While these behaviors on their face are inappropriate and disruptive in nature, there are no diagnostic tests or longitudinal evidence that these behaviors are firmly established components of MLK's innermost character. In other words, none of the health care providers offered evidence that failed to link Plaintiff's behaviors to environmental stimuli.

Even if the Magistrate presumes that MLK's behavior was ingrained, there is no longitudinal evidence from which the Commissioner could determine that she had **marked** restrictions of activities of daily living; or **marked** difficulties in maintaining social functioning; or **marked** difficulties in maintaining concentration, persistence, or pace or that she had a functional deterioration of a previously working structure. Thus, there is no evidence from which the ALJ could determine that MLK had difficulties of the severity required to meet the A or B standards.

There is a lack of substantial evidence to demonstrate compliance with Listing 112.08. Accordingly, the ALJ did not err in failing to consider if MLK's impairments met Listing 112.08.

### IX. CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

    /s/ Vernelis K. Armstrong
    United States Magistrate Judge

Date: July 28, 2011

19